**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**DALTON WALLACE,**

                   **Plaintiff,**

-vs-                                           **Case No.  A-10-CA-039-SS**

**SANTA CRUZ HARLEY-DAVIDSON, INC. and
R. MICHAEL JAMES,**

                   **Defendants.**

_____

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

BE IT REMEMBERED on the 25th day of August 2010 the Court held a bench trial and the parties appeared in person or through counsel.  The trial of this matter lasted one day and the Court heard testimony from the following witnesses: Hubert Dalton Wallace, Robert Michael James, and Richard C. King, Jr.  After considering the evidence and testimony presented at trial, the attorneys' arguments, the parties' briefs, and the relevant law, the Court enters the following findings of fact and conclusions of law.

**Facts**

This is the story of a contract between a trusting but utterly careless businessman, and a man who filed a false affidavit with the Court seeking to escape personal liability on a note.  Defendant James started Santa Cruz Harley-Davidson, Inc. ("SCHD") in March of 1996. Stipulated Facts [#63] at ¶ 4a.  James was the 100% shareholder, owner, and President of Defendant SCHD.  *Id.* at ¶ 4b-c. SCHD had an existing debt of $200,000 to non-parties, Lauren and Steve Spilman and James was also personally liable on the note which was due by the end of July 2005.  *Id.* at ¶ 4d-e; Pl. Ex. 11-

12.  In mid-July 2005, a few weeks before the debt was due to the Spilmans, James contacted Plaintiff Wallace, whom James had known for years, and Wallace agreed to loan James $200,000.

Wallace is a long-time businessman with a degree in accounting.  He has previously owned a bank, worked with the senior loan committee, and worked in real estate transactions.  He currently is the CEO of Safesite, Inc., a business records storage company.  Wallace has also made many personal loans in the past.  It was his standard practice only to loan money to individuals, not their businesses.  True to form, Wallace agreed to loan $200,000 to James personally, although he knew it would be used in connection with SCHD.  Wallace and James orally agreed to the terms of the loan including a 1% origination fee due up front, 10% interest, and a term of two years.  Wallace told James to prepare the loan document.  Stipulated Facts at ¶ 4g.

On July 18, 2005, James faxed Wallace a draft promissory note prepared by his attorneys.  Pl. Ex. 1.  It was undated, unsigned, and named SCHD as maker for a $200,000 loan to SCHD.  Wallace reviewed the draft and recognized it did not memorialize their agreement regarding personal liability.  It also did not provide for the origination fee.  On July 22, 2005, Wallace faxed James, at SCHD's office, a copy of the July 18, 2005 draft and cover letter which included Wallace's handwritten notes instructing James to "add personal liability" and "change to paying origination fee up front, otherwise all is well."  Pl. Ex. 2.  James did not see this fax when it was sent because he was at a trade show in Denver, Colorado.

On July 24, 2005, from Denver, James faxed Wallace a note and the same draft promissory note sent July 18, 2005.  Pl. Ex. 3.  This draft did not make either change requested by Wallace, presumably because James had not yet seen Wallace's July 22 fax.  Instead, it still named SCHD as maker.  James stated he had "perhaps presumptuously" filled in the blanks of the previous draft note

-2-

and signed it.  *Id.*  James wrote at the end of the note that "[i]f [Wallace] want to make changes to the note–no problem.  We can figure something out for getting them printed and signed."  *Id.*  James also wrote he was hoping to get the loan accomplished quickly because he had "perhaps prematurely" notified the Spilmans he would pay their loan by Friday, July 29th because he "figured that would have given us enough time to execute a note and wire monies, etc."  *Id.*  James also needed to finish the transaction because he was leaving the next day for a month-long vacation at his remote property in Canada where he would be "out of touch with the conveniences of the business world (internet, fax, reliable phone, printers, etc.)."[1]  *Id.*

Wallace, although still not in possession of a note memorializing the agreement—indeed not in possession of any binding note at all, but one which James allowed could still be changed—but based on the understanding the draft note would be corrected as he had instructed, and trusting his acquaintance of many years, Wallace sent a check for $200,000 to SCHD as James had requested. James, simultaneously, and also not in possession of any binding note requiring it, sent Wallace a check for $2,000 for the origination fee.  On July 26, 2005, the $200,000 check was deposited in SCHD's bank and the following day SCHD gave a check to the Spilmans to pay off their loan of $200,000.  On July 27, 2005, Wallace received the origination fee payment.

Following his vacation, James returned to Santa Cruz and faxed Wallace on August 25, 2005. He stated he would finalize the agreement within the next couple of days.  Pl. Ex. 4.  On August 26, 2005, James faxed Wallace a copy of the final promissory note and "signed an original and put it in the mail."  Pl. Ex. 5.  This note made the corrections Wallace had requested on July 22, 2005: James

---

[1]For a person who needed to finish a $200,000 transaction in order to pay an old debt on time, James also seemed in a great hurry to begin a month-long vacation where he would be virtually unreachable.

was listed as the maker and thus liable on the note, and the up-front origination fee was included. Pl. Ex. 6.  James dated the note July 22, 2005.  *Id.*  This is the only valid promissory note memorializing the agreement between James and Wallace.

James made the required regular quarterly interest payments, but SCHD began to falter.  On July 13, 2007, shortly before the principal would be due on the note, James called Wallace to request an extension of one year on the term of the note.  Wallace agreed to the extension on the same terms and conditions.  Shortly thereafter, James sent Wallace a letter confirming their phone conversation. Pl. Ex. 8.  Per their earlier discussion, James included an "amended Promissory Note" and thanked Wallace for his flexibility in extending the term of the note from a July 24, 2007 maturity date to July 24, 2008.  *Id.*  The attached note, however, was *not* the valid note the parties had previously agreed to, but a version of the earlier draft note naming SCHD as the maker and failing to include the up-front origination fee.  *Id.*  James signed "Amended 7/13/07," hand wrote changes to the term from two to three years, and initialed the changes.  *Id.*  Wallace carelessly failed to read the note and thus failed to notice it named SCHD as maker and did not include liability for James personally. Instead, Wallace simply initialed the changes to the term and sent a copy back to James.

In July 2008, the promissory note came due, but James made no effort to pay.  On November 5, 2008, Wallace faxed James a copy of the valid note writing "Just to remind you!" on the bottom of the page. Pl. Ex. 9.  James did not contact Wallace in response.  Around November 2008, SCHD was permanently closed.  Later, James called Wallace and said he had not been able to find a buyer of SCHD in order to pay the note and now the business was closed.  James offered no alternative to repay and stated he would not be making any more interest payments and did not intend to repay the principal.  James has made no effort to repay since November 2008.

Wallace filed this suit in December 2009. Defendants filed for summary judgment in March 2010 largely on the basis of James' affidavit. Importantly, James swore in his affidavit he had initially prepared a note including personal liability, but "Wallace then contacted me and informed me that he was not agreeing to make a personal loan to me, but would agree to loan SCHD $200,000." Pl. Ex. 10. James further altered the timeline of the faxes between the parties in order to make it seem as though Wallace was insisting SCHD be liable and Wallace was specifically rejecting personal liability for James. At trial in August 2010, James admitted his affidavit was false and he had known it was false once he read Wallace's response to the summary judgment motion filed March 26, 2010. Instead, James testified at trial Wallace clearly stated James would be personally liable. James also admitted he issued the promissory note on which he is liable and he made a personal commitment to Wallace. Until trial, James made no effort to inform the Court his affidavit was untrue.[2]

## Analysis

### I.      Personal Liability

The question of James' personal liability for the $200,000 debt was answered by James himself at trial. At trial James testified he intended to be legally bound by the promissory note and no documents were executed to release him from personal liability. The Court concludes likewise. There is no question the operative promissory note is the note dated July 22, 2005 and listing James

---

[2]Defendants did file a motion to withdraw the affidavit from the record three weeks after trial asserting "[t]o the extent that [James'] Affidavit was inaccurate, it was based on faulty memory." There is no legal reason to cleanse the record of the false affidavit which clearly reflects on the credibility of James' testimony.

as the maker.  As such, James is personally liable on that note.  The Court will address James'
defenses below.

Even if James had not admitted on the stand that he agreed to be personally liable, there is
no question this was a personal loan on which James agreed to be personally liable.  As discussed
above, Wallace is a sophisticated businessman who is experienced in lending money.  Both parties
testified no bank would loan money to SCHD, so it makes no logical sense for Wallace to make a
loan to SCHD without personal liability.  Granted, Wallace was not in top form as a sophisticated
businessman when he failed to obtain final documentation *before* sending $200,000, nor when he
failed to read the extension document which listed SCHD as maker.  However, there is no question
Wallace did not accept the draft note naming SCHD as maker.  Wallace made his intentions clear
in the handwritten note he faxed back requiring James to add personal liability and an up-front
origination fee.  The note naming James as maker is the only valid note in this case.  Pl. Ex. 7.  The
Court must still address James' defenses to liability and the legal effect of the extension naming
SCHD as maker.

## II.    Consideration

As Court explained at trial, the defense of consideration is meritless.  James essentially
argues there was no consideration for the promissory note executed on August 26, 2005 which
named James as maker.  Since Wallace had already sent the money while in possession of the draft
note listing SCHD as maker, James argues his agreement to be personally liable is gratuitous.  This
ignores the evidence.  James testified the original note was a draft and James included a note
indicating he would make any changes.  Clearly, although not the best practice, there is consideration
for a loan even if money is sent before the parties have finalized the loan agreement.  The first draft

note James sent to Wallace was undated, unsigned, and identified by James as a draft.  *See* Pl. Ex. 1.  Wallace responded four days later indicating James needed to add personal liability and an up-front origination fee, but otherwise "all is well [and] I will mail check today."  At that point, both parties knew, or should have known,[3] they did not have a final note in place.

James certainly did not believe the agreement was final because he sent the signed version of the draft note two days later which he admitted he had signed "perhaps presumptuously" and indicated again that Wallace could "make changes to the note—no problem."  However, James sent this presumptuously signed document less than twenty-four hours before flying to his remote vacation where he would be unavailable for communication with Wallace for the next month.  Thus, it is clear the note signed later that month, and incorporating the changes requested by Wallace, was the only valid promissory note and the $200,000 was valid consideration for the note.  In addition, James was personally benefitted by the loan because it allowed him to pay off the loan to the Spilmans which was due shortly thereafter and for which he was also personally liable.

## III.   Novation

The parties failed to discuss novation in any of their pre-trial briefing, but the Court requested they address the issue post-trial.  Since the promissory note makes James personally liable, what effect does the extension have on James' liability when the extension "extended" a contract which was not previously valid?  Under California law a novation requires the creditor's consent and an expressed intent to release the original debtor.[4]  CAL. CIV. CODE § 1531(2); *see also Wells Fargo*

---

[3]James testified he did not receive Wallace's responsive fax until late August when he returned from his Canadian vacation.

[4]Neither party raised the issue of California law.  However, the note and the extension clearly state each is "governed by the laws of the State of California."  Pl. Ex. 7, 8.

*Bank, N.A. v. Bank of Am. NT & SA*, 38 Cal. Rptr. 2d 521, 525 (Cal. Ct. App. 1995) (to constitute

a novation, the former debtor must be released from his obligation by the consent of the creditor);

*Howard v. County of Amador*, 269 Cal. Rptr. 807, (Cal. Ct. App. 1990) (stating it must "clearly

appear that the parties intended to extinguish rather than merely modify the original agreement").

In addition, acceptance of payment from SCHD on behalf of James also does not release James from

liability. *See Univ. of Redlands v. Ford*, 56 Cal. App. 2d 151, 152 (Cal. Dist. Ct. App. 1942).  At

trial, James testified he was personally liable on the promissory note and never executed any other

document indicating Wallace's intent to release James from liability.  Wallace also testified he never

agreed to release James and had no intent in executing the extension to change any of the terms of

the agreement except the date payment was due.  Thus, the extension did not act as a novation.

## IV.     Accord and Satisfaction

The parties also failed to discuss the possibility the extension could serve as accord and

satisfaction of the original debt.  For essentially the same reason the extension did not act as a

novation, it also did not act as accord and satisfaction.  Under California law, "[a]n accord is an

agreement to accept, in extinction of an obligation, something different from . . . that to which the

person agreeing to accept is entitled." CAL. CIV. CODE § 1521.  Satisfaction is "[a]cceptance, by the

creditor, of the consideration of an accord." *Id.* at § 1523.  The parties did not establish any

agreement to substitute a new debtor for James.  The fact that Wallace accepted payment from

SCHD is insufficient to show an agreement to extinguish James' obligation. *See Univ. of Redlands*,

56 Cal. App. 2d at 152 ("acceptance of payment from a new [note holder] does not amount to a

contract to release the original debtor").  Rather both agree they had an oral agreement to extend the

note based on its original terms, but there was an unknown, underlying disagreement about what

those terms were.[5] Although the new agreement failed to extend the note on its original terms, this does not indicate an agreement to accept payment from SCHD "in extinction of an obligation" of James.

## V.   Attorneys' Fees

There were several issues in this case almost entirely unexplored by counsel.  The Court raised its concerns about the application of California law, the possibility of novation or accord and satisfaction, and the issue of whether SCHD was liable at all.[6]  In short, this was not an example of exhaustive legal work.  Yet counsel testified to spending approximately 300 hours total on this case, between paralegals and lawyers, and Wallace requests over $85,000 in attorney's fees.

The express terms of the note allow Wallace, as the prevailing party, to an award of reasonable attorneys' fees.  Pl. Ex. 7.  Wallace submitted evidence at trial that the reasonable and necessary attorneys' fees incurred in this case were $85,946.50 through August 23, 2010 plus additional fees for post-trial work for a total of $125,000.  This case was a contractual dispute on a promissory note.  The promissory note at issue, and each of the draft notes, is an uncomplicated, one-page document.  Counsel testified he took two depositions, responded to a summary judgment motion, amended the complaint, and negotiated a discovery dispute.  Wallace has actually spent

---

[5]James' entire argument is premised on the validity of the original note naming SCHD as maker.  Since the Court finds the SCHD note was not valid and the only valid note was the note naming James as maker, James' alleged belief that the extension was based on the original terms fails to justify liability for SCHD rather than James personally.

[6]Admittedly this issue is mostly academic since the parties agree SCHD has no assets or bank account as of June 2010, however plaintiffs suing multiple defendants should at least make an attempt to argue for the liability of each one.

$58,870.89 on attorneys' fees and costs through August 20, 2010, according to the billing records submitted.  Pl. Ex. 13.

In a federal action, "[s]tate law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision."  *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir.2002).  Although the parties spent little time addressing any specifics of California law, the note clearly states California law applies and the Court's conclusions are based on California law.  California Code of Civil Procedure section 1033.5(a)(1) permits recovery of attorney fees "when authorized by . . . contract."  California Civil Code section 1717(a) addresses recovery of attorney fees in contract actions and provides:

> In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract . . . shall be entitled to reasonable attorney's fees in addition to other costs.

Moreover, "an obligation to pay attorney fees incurred in the enforcement of a contract 'includes attorneys' fees incurred in defending against a challenge to the underlying validity of the obligation.'"  *Siligo v. Castellucci*, 26 Cal. Rptr. 2d 439, 442 (1994) (quoting *Finalco, Inc. v. Roosevelt*, 3 Cal. Rptr. 2d 865, 869 (1991)).

"The matter of reasonableness of attorney's fees is within the sound discretion of the trial judge." *Stokus v. Marsh*, 266 Cal. Rptr. 90 (1990).  The Ninth Circuit Court of Appeals has outlined factors to consider regarding the reasonableness of attorneys' fees:

> In calculating reasonable attorney fees the court must consider the following factors: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill necessary to perform the legal services properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed

-10-

by the client or circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relations with the client, and (12) awards in similar cases.

*Lafarge ConseilsEtEtudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1341-1342 (9th Cir. 1986). The California Court of Appeals has provided a similar list of factors to consider:

In determining what constitutes a reasonable compensation for an attorney who has rendered services in connection with a legal proceeding, the court may and should consider the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded, the intricacies and importance of the litigation, the labor and necessity for skilled legal training and ability in trying the cause, and the time consumed.

*Hadley v. Krepel*, 214 Cal. Rptr. 461, 464 (1985) (citations omitted).

Considering the lack of novelty of the questions involved and the skill necessary, compared to the skill employed, to perform the legal services necessary on this type of case, the Court finds the amount requested to be unreasonable. However, the time and labor required were more than in a standard collection case in large part because of James' false affidavit which deliberately obfuscated the timeline of events in order to avoid liability. In addition, counsel succeeded in obtaining the full result sought by his client, even in the face of a defendant willing to lie under oath and failing to correct his misrepresentations in an attempt to obtain summary judgment. In short, a large portion of the fees billed to Wallace, especially those surrounding the summary judgment response and investigation, were solely the result of the actions of James contesting the validity of a note he eventually admitted he drafted and signed with the intention of being personally liable.

In addition, there is evidence Wallace has already paid $58,870.89 in fees, not including trial and post-trial work. Considering the amount involved, $200,000 plus pre-judgment interest and post

judgment interest, it is unsurprising Wallace was willing to pay these fees, and there is no indication his fee agreement was unreasonable.  In short, it is reasonable for Wallace to recover the actual amounts he has paid.  In addition, based on experience, the Court would add twenty hours for trial preparation after the last date in the billing records and six hours for trial.  Finally, the Court adds an additional five hours for post-trial work.  $300 per hour is a reasonable hourly fee for this work, thus the Court adds $9,300 in fees to what Wallace has already paid, for a total of $68,170.89.

### Conclusion

Wallace agreed to loan James $200,000.  Despite James' deliberate, or negligent, efforts to create paperwork that would reflect a loan to SCHD instead of James, the only valid promissory note is the July 22, 2005 note naming James as maker and imposing full liability on James personally.  Despite James' deliberate, or negligent, efforts to extinguish his personal liability by submitting an earlier draft note to memorialize the extension, the only valid promissory note is the July 22, 2005 note naming James as maker and imposing full liability on James personally.  Despite James' deliberate, or negligent, efforts to obtain summary judgment on the basis of a false affidavit, forcing Wallace to incur significant attorneys' fees, Wallace ultimately prevailed.  As a result, Wallace is entitled to recover the $200,000 owed under the promissory note, pre- and post-judgment interest, and reasonable attorneys' fees of $68,170.89 from James personally.   Thus,

IT IS ORDERED that Defendant Robert Michael James shall pay damages in the amount of TWO HUNDRED THOUSAND DOLLARS ($200,000), pre-judgment interest at the contractual rate of 10%, and post-judgment interest at the rate of 0.25%.  In addition, Defendant Robert Michael James shall pay Plaintiff Dalton Wallace's reasonable attorneys'

fees of SIXTY-EIGHT THOUSAND ONE HUNDRED SEVENTY DOLLARS AND EIGHTY-NINE CENTS ($68,170.89).

SIGNED this the 29th day of September 2010.

_____

SAM SPARKS
UNITED STATES DISTRICT JUDGE